UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA and
THE STATE OF NEW JERSEY, ex
rel. NICHOLAS M. DEPACE,

        Plaintiff,

    v.

THE COOPER HEALTH SYSTEM, et
al.,

        Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 08-5626
(JEI/AMD)

**OPINION**

**APPEARANCES:**

CARL D. POPLAR
1010 Kings Highway South
Building Two
Cherry Hill, NJ 08034

JACOBS & BARBONE, ESQS.
By: Louis M. Barbone
1125 Pacific Avenue
Atlantic City, NJ 08401
    Counsel for Nicholas M. Depace

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, *pro se*
By:  Jesse Abrams-Morley, Esq.
    Gaetan J. Alfano, Esq.
1818 Market Street, Suite 3402
Philadelphia, PA 19103

**IRENAS**, Senior District Judge:

    Pending before the Court is Relator Nicholas DePace's

"Application for Emergent Relief to Reopen Pursuant to L. Civ. R.

41.1(b) and for the Court's Determination of Reasonableness of

Attorney's Fee Pursuant to L. Civ. R. 103.1(a)" (the
"Application").  For the reasons discussed below, Relator's
Application to Reopen will be granted; however, the relief
requested by the Relator will be denied.

## I.

On November 12, 2008, Relator Nicholas DePace, M.D.,
initiated this *qui tam* action against the Cooper Health System,
Cooper University Hospital (collectively "Cooper"), and
Cardiovascular Associates of the Delaware Valley, P.A.
(Pietragallo Br. in Opp. Ex. H., at 1.)[1]  Dr. Depace's action was
pursuant to the *qui tam* provisions of the Federal False Claims
Act, 31 U.S.C. § 3730(b), and the New Jersey False Claims Act,
N.J. Stat. Ann. § 2A:32C-1, *et seq*. (Pietragallo Br. in Opp. Ex.
H., at 1.)  These *qui tam* provisions allow private citizens to
file actions on behalf of the Government in cases where people or
companies have allegedly made false or fraudulent claims against
the Government.  *See* 31 U.S.C. § 3730(b) ("A person may bring a
civil action for a violation of section 3729 for the person and
for the United States Government. The action shall be brought in
the name of the Government."); N.J. Stat. Ann. § 2A:32C-5(b) ("A

---

[1]  Citations in this form are to "Respondent's Brief in
Opposition to Plaintiff's Application for Emergent Relief
Pursuant to L. Civ. R. 65.1, Motion to Reopen Pursuant to L. Civ.
R. 41.1(b) and Motion to Invoke the Court's Review of Counsel
Fees Pursuant to L. Civ. R. 103.1(a)."

person may bring a civil action for a violation of this act for the person and for the State. Civil actions instituted under this act shall be brought in the name of the State of New Jersey.").

Dr. DePace's Complaint alleged that the Defendants "paid millions of dollars in illegal kickbacks to physicians to induce them to refer patients to Cooper for expensive in-patient and out-patient cardiac services." (DePace Aff. Ex. 1, March 11, 2013.)  Allegedly, these kickbacks caused false claims to be made against the Federal and New Jersey Governments because Cooper subsequently billed Medicare and Medicaid programs for services resulting from the tainted referrals. (Pietragallo Br. in Opp. Ex. H, at 2.)

Dr. DePace retained the law firm of Pietragallo, Gordon, Alfano, Bosick, & Raspanti, LLP (the "Pietragallo Firm") to represent him in the *qui tam* litigation.  (Pietragallo Br. in Opp., at 4.)  This representation was secured through a contingency fee agreement (the "Contingency Fee Agreement") entered into by the Pietragallo Firm and Dr. DePace.  (*Id*.) Under the Contingency Fee Agreement, Dr. DePace was not obligated to pay the Pietragallo Firm unless there was a recovery in his *qui tam* action.  (*Id.* Ex. G, at 3.)  However, in the case of a recovery prior to the commencement of trial, the Contingency Fee Agreement required Dr. DePace to pay the Pietragallo Firm forty

percent of the gross recovery.  (*Id.*)  The Contingency Fee Agreement also contemplated what would happen if Dr. DePace were to receive statutory attorneys' fees from the Defendants in this case, stating:

> [i]f there is a judgment, settlement or arbitration award, the Federal and state False Claims Act statutes provide that attorney's fees and costs may be paid by the defendants ("Statutory Attorneys' Fees and Costs"). **This is in addition to any Attorney's Contingency Fees we may receive pursuant to Paragraph 6B of this Agreement.**

(*Id.* (emphasis in original))  The Contingency Fee Agreement also includes an Alternate Dispute Resolution clause which states that "any disputes between us will be resolved by alternate dispute resolution," and that "Pennsylvania law shall apply to any dispute arising under the terms of this agreement." (*Id.* Ex. G., at 6.)  Dr. DePace's personal counsel, Joseph Milestone, assisted Dr. DePace during the negotiation of the Contingency Fee Agreement.  (DePace Aff. ¶ 13, March 11, 2013; Pietragallo Br. in Opp., at 4-6.)  Under the Contingency Fee Agreement, Milestone would receive twenty-five percent of the Pietragallo Firm's contingent fee for providing services as local counsel. (Pietragallo Br. in Opp. Ex. G, at 2.)

On January 22, 2013, the United States and the State of New Jersey elected to intervene in Dr. DePace's *qui tam* litigation for the purposes of settlement. (Notice of Election to Intervene

in Part and to Decline to Intervene in Part.)  On that same date, a Joint Stipulation of Dismissal of Relator's Complaint was filed with the Court stating that the United States, the State of New Jersey, Dr. DePace, and Cooper had entered into a settlement agreement (the "Settlement Agreement").  (Joint Stipulation of Dismissal of Relator's Compl.)  Under the Settlement Agreement, Cooper agreed to pay the United States $10,269,000.00 plus interest, and the State of New Jersey $2,331,000.00 plus interest.  (Pietragallo Br. in Opp. Ex. H, at 3.)  Out of the money received from Cooper, the United States agreed to pay Dr. DePace $1,951,110.00 and New Jersey agreed to pay Dr. DePace $442,890.00.  (*Id.*)  Lastly, Cooper agreed to pay Dr. DePace's counsel $430,000 for expenses, attorneys' fees, and costs.  (*Id.*)  Specifically, the Settlement Agreement stated that "Cooper agrees to pay Relator's Counsel, and Relator's Counsel agree to accept as full payment $430,000 for expenses, and attorney's fees and costs in accordance with subsection 3730(d)(1)."  (*Id.*)  In an invoice detailing all the hours spent by the Pietragallo Firm on this case sent by the Pietragallo Firm to counsel for Cooper shortly prior to settlement, the Pietragallo Firm represented its total fees and costs to be $458,420.55.  (Pl.'s Supplemental Br. Ex. 2.)

The Pietragallo Firm instructed the United States and the

State of New Jersey to deposit Dr. DePace's share of the
settlement into the Pietragallo Firm's IOLTA account.
(Pietragallo Br. in Opp., at 11.)  On January 31, 2013, the
Pietragallo Firm sent to Dr. DePace and his current counsel Carl
Poplar a distribution memo (the "Distribution Memo") detailing
how funds would be distributed from the IOLTA account.  (*Id.* Ex
K.)  The Distribution Memo allocated thirty percent of Dr.
DePace's share to the Pietragallo firm and ten percent to
Milestone, accounting for the entire forty percent contingency
fee.  (*Id.*)  However, Milestone notified the Pietragallo Firm
that he would not be seeking any fees for his work in this case.
(Pietragallo Letter, April 4, 2013.)  Consequently, the
Pietragallo Firm wired Milestone's share to Dr. Depace on April
3, 2013, effectively reducing the contingency fee to thirty
percent, and allowing Dr. DePace to receive $1,682,142.45, or
seventy percent of his share, under the terms of the Distribution
Memo.[2]  (*Id.*)

      The day after the Pietragallo Firm sent Dr. DePace and

---

      [2]  Under the terms of the Contingency Fee Agreement, the
Pietragallo Firm had no obligation to return Milestone's
uncollected fee.  Mr. Milestone's contingency fee was to be paid
out of the Pietragallo Firm's contingency fee.  (Pietragallo Br.
in Opp. Ex. G.)  Thus, in the scenario where Milestone decided
not to collect his fee, the Pietragallo Firm was entitled to the
full forty percent contingency fee.  As stated in the body of the
Opinion, returning Milestone's fee to Dr. Depace had the effect
of reducing the amount of the contingency fee from forty percent
to thirty percent.

Poplar the Distribution Memo, Poplar sent an e-mail to the Pietragallo Firm stating that he had "reservations" about the Contingency Fee Agreement. (Pietragallo Br. in Opp. Ex. T.)  At a meeting held on February 6, 2013, Poplar stated his position that the Contingency Fee Agreement may be unenforceable. (Pietragallo Br. in Opp., at 13).  Consequently, the Pietragallo Firm sought to initiate the alternate dispute resolution procedures outlined in the Contingency Fee Agreement. (*Id.*, at 14.)  However, Dr. DePace, through Counsel, declined the invitation to alternate dispute resolution on the belief that the alternate dispute resolution procedures in the Contingency Fee Agreement were unenforceable. (*Id.* Ex. M.)

In response to Dr. DePace's refusal to pursue alternate dispute resolution, on February 19, 2013, the Pietragallo Firm filed a Petition to Compel Arbitration before the Court of Common Pleas of Philadelphia, (*Id.* Ex. N,) and on February 22, 2013, the Pietragallo Firm filed a Motion to Preserve the Status Quo of Disputed Funds before the same court (*Id.* Ex P.)

Five days later, Dr. DePace filed the Application in this Court.  In the Application, Dr. DePace asks this Court to enjoin the state court proceedings initiated by the Pietragallo Firm, to hold that the Settlement Agreement superseded the Contingency Fee Agreement, or in the alternative to hold that the Contingency Fee

Agreement is either unreasonable, or disallowed by the Federal
False Claims Act.  Dr. DePace has filed four briefs in support of
his application, and the Pietragallo Firm has filed three briefs
in opposition.  Oral argument was held on April 19, 2013.  At
this time, the Court does not need to determine whether to enjoin
the state court proceedings because the Pietragallo Firm has
agreed not to proceed with the state court proceedings until
resolution of Dr. DePace's Application before this Court.  Still
at issue, however, is the validity and reasonableness of the
Contingency Fee Agreement.

## II.

To the extent that Dr. DePace's Application specifically
asserts that the Settlement Agreement supersedes the Contingency
Fee Agreement, this Court has jurisdiction to reopen the case.
The Court's Order of January 24, 2013, which dismissed the case,
stated explicitly that this Court "shall retain jurisdiction over
any disputes that may arise regarding compliance with the
Settlement Agreement."  (Order, January 24, 2013.)  Whether the
terms of the Settlement Agreement obviate Dr. DePace's obligation
to comply with the Contingency Fee Agreement is clearly a dispute
"regarding compliance with the Settlement Agreement."

Further, this Court has jurisdiction to reopen the case
because the Court has ancillary jurisdiction over disputes

regarding fees and costs.  *See Novinger v. E.I. DuPont Nemours & Co., Inc.*, 809 F.2d 212 (3d Cir. 1987); *see also Kant v. Seton Hall University*, 422 Fed. App'x 186, 188 n.3 (3d Cir. 2011) (citing *Kalyawongsa v. Moffett*, 105 F.3d 283 (6th Cir. 1997), for the proposition that "'although attorneys' fee arrangements are contracts under state law, the federal court's interest in fully and fairly resolving the controversies before it requires courts to exercise supplemental jurisdiction over fee disputes that are related to the main action.'") In *Novinger*, the Third Circuit recognized that "the federal forum has a vital interest in [attorneys' fee arrangements] because they bear directly upon the ability of the court to dispose of cases before it in a fair and reasonable manner."  809 F.2d at 217.  Therefore, the Third Circuit held that the district court properly concluded that "although there was no diversity of citizenship between the Novingers and their former counsel there was ancillary jurisdiction over the dispute over fees and expenses."  *Id.*

Similar to *Novinger*, the instant case involves a fee dispute between a client and his former counsel concerning the fees owed to counsel for representation in a federal action.  Therefore, as in *Novinger*, although there is no diversity of citizenship between the Pietragallo Firm and Dr. DePace, there is ancillary jurisdiction over the dispute over fees and expenses.  *See id.*

9

In arguing that the Court does not have jurisdiction over this fee dispute, the Pietragallo Firm relies on this district's unreported decision in *Knoepfler v. Guardian Life Ins. Co. of America*, 2010 WL 3001380 (D.N.J. 2010), which has never been cited by any court, for the proposition that ancillary jurisdiction only attaches to fee disputes that arise while the main action is still pending.  (Pietragallo Br. in Opp., at 24.) The Pietragallo Firm's reliance on *Knoepfler* is misplaced. Unlike in the instant case, in *Knoepfler*, the attorney who initiated litigation over the fee dispute "did not appear on its own behalf in any context before the [main action] was conclusively resolved."  2010 WL 3001380, at *3.  This represents a factual scenario that the Third Circuit explicitly declined to address in *Novinger*.  *See* 809 F.2d at 218 n.4 ("We leave for another day the question whether ancillary jurisdiction extends to the resolution of a post settlement fee dispute between two attorneys, only one of whom was attorney of record.").  In the instant case, the Pietragallo Firm was counsel of record throughout the five year duration of the *qui tam* action.

Further, to the extent that *Knoepfler* suggests that a federal court does not have ancillary jurisdiction over a fee dispute that arises after the main action has terminated, this Court disagrees.  In *Novinger*, in dealing with a fee dispute that

10

arose after a substitution of attorneys, the Third Circuit stated that:

> in the context of contingent fee litigation the nature of such disputes is such that they cannot be resolved at the time the court acts to permit substitution of counsel. At that point in the lawsuit, the reasonable value of the attorney's services cannot be determined because it must be measured, at least in part, against the results obtained.

809 F.2d at 218. Therefore, the Third Circuit concluded that "the rule of necessity . . . must be broad enough to permit the resolution of those disputes after the underlying case has been resolved by judgment or settlement." *Id*. Although the instant case does not involve the substitution of attorneys, similar to *Novinger*, at issue is a contingent fee dispute which could not be resolved until after the conclusion of the litigation because "the reasonable value of the attorney's services . . . must be measured, at least in part, against the results obtained." *Id*. Thus, the fact that Dr. DePace's *qui tam* litigation has settled is of no moment.

This understanding of a federal court's ancillary jurisdiction over fee disputes is consistent with precedent from the Supreme Court and other circuits. *See Cooter & Gell v. Hartmarx*, 496 U.S. 384, 395 (1990) (stating that "[i]t is well established that a federal court may consider collateral issues after an action is no longer pending"); *In re Austrian and German*

11

*Bank Holocaust Litigation*, 317 F.3d 91 (2d Cir. 2003) (stating
that "[w]henever a district court has federal jurisdiction over a
case, it retains ancillary jurisdiction after dismissal to
adjudicate collateral matters such as attorney's fees"); *Zucker
v. Occidental Petroleum Co.*, 192 F.3d 1323, 1329 (9th Cir. 1999)
("No Article III case or controversy is needed with regard to
attorneys' fees as such, because they are but an ancillary matter
over which the district court retains equitable jurisdiction even
when the underlying case is moot.  Its jurisdiction outlasts the
'case or controversy.'").  Therefore, the Pietragallo Firm's
reliance on *Knoepfler* does not persuade this Court that it lacks
ancillary jurisdiction over the instant fee dispute.

### III.

Dr. DePace's primary argument before the Court is that the
Pietragallo firm is not entitled to the fees it is owed under the
Contingency Fee Agreement because the Settlement Agreement
supersedes the Contingency Fee Agreement.  (Pl.'s Supplemental
Br., at 7.)  Specifically, Dr. DePace argues that "Nicholas
DePace, and the respondent law firm clearly modified the 2008
[Contingency Fee Agreement] by articulating and agreeing to new
terms on the same topic of counsel fees within the Settlement
Agreement." (*Id.*)  Therefore, Dr. DePace argues, because the
Settlement Agreement identifies the $430,000 to be paid by the

defendants as "full payment," the Pietragallo Firm has forfeited its right to the fees it would receive under the Contingency Fee Agreement.

The Court finds this argument unpersuasive because it mischaracterizes the Settlement Agreement and the Contingency Fee Agreement as covering the "same topic." In *Venegas v. Mitchell*, the Supreme Court analyzed the fee shifting provisions of 42 U.S.C. § 1988 ("§ 1988"), which states that a court may require a defendant to pay to a prevailing plaintiff "a reasonable attorney's fee as part of the costs." 495 U.S. 82 (1990). The Supreme Court's reasoning in *Venegas* makes clear that statutory fees and contingent fees are not the "same topic." Specifically, the Court stated that the statute:

> controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer. What a plaintiff may be bound to pay and what an attorney is free to collect under a fee agreement are not necessarily measured by the "reasonable attorney's fee" that a defendant must pay pursuant to a court order.

*Id.* at 90.

Under the reasoning in *Venegas*, contrary to Dr. DePace's assertions, the Settlement Agreement and the Contingency Fee Agreement do not cover the "same topic." The Contingency Fee Agreement governs what Dr. DePace, as the prevailing plaintiff, must pay the Pietragallo Firm, while the Settlement Agreement

13

governs what Cooper, as the losing defendants, must pay under the fee shifting provisions of the Federal False Claims Act. *See id.* In this context, the phrase "full payment" in the Settlement Agreement can only be interpreted as defining Cooper's obligations, and not Dr. DePace's. Thus, the Court finds that the Pietragallo Firm's acceptance of $430,000 as "full payment . . . for expenses, and attorney's fees and costs in accordance with subsection 3730(d)(1)" in the Settlement Agreement does not modify any of the terms in the Contingency Fee Agreement, including those which require Dr. DePace to pay his lawyers a contingency fee in addition to statutory fees the firm received from Cooper.

## IV.

In addition to arguing that the Settlement Agreement supersedes the Contingency Fee Agreement, Dr. DePace argues that the fee shifting provisions of the Federal False Claims Act do not permit an attorney to recover both a contingent fee and statutory attorneys' fees. (Pl.'s Br. in Further Supp., at 24; Pl.'s Supplemental Br., at 3-4.)[3]  The Federal False Claims Act

---

[3]  In his supplemental brief, Dr. DePace briefly attempts to argue that the New Jersey False Claims Act also prohibits an attorney from receiving both statutory and contingency fees. (Pl.'s Supplemental Br., at 2-4.)  This argument is irrelevant. Under the terms of the Settlement Agreement, the Pietragallo Firm only received statutory fees under the fee shifting provisions of the Federal False Claims Act.  Therefore, the Court does not respond to this argument in this Opinion.

14

has two fee shifting provisions.  31 U.S.C. § 3730(d)(1)

("§ 3730(d)(1)") applies in cases like the instant case, where

the Government opts to intervene in the *qui tam* action.  Section

3730(d)(1) provides that any successful litigant "shall also

receive an amount for reasonable expenses which the court finds

to have been necessarily incurred, plus reasonable attorneys'

fees and costs.  All such expenses, fees, and costs shall be

awarded against the defendant."  31 U.S.C. § 3730(d)(2)

("§ 3730(d)(2)") applies in cases where the Government opts not

to intervene; however, the language in § 3730(d)(1) and

§ 3730(d)(2) is identical.  Dr. DePace argues that because the

Federal False Claims Act states that "all" attorneys' fees are to

be awarded against the defendant, the statute does not allow for

attorneys to receive additional fees from clients through

contingency agreements.  (Pl.'s Br. in Further Supp., at 24;

Pl.'s Supplemental Br., at 3-4.)

Whether the Federal False Claims Act allows an attorney to

receive both statutory fees and a contingency fee is an issue of

first impression in this Circuit.  Nonetheless, after considering

the submissions of the parties, decisions in other circuits, and

legislative intent, the Court is convinced that the statute does

allow for an attorney to recover both fees.

The Supreme Court's reasoning in *Venegas*, cited in Part III,

15

is again relevant.  In *Venegas*, as a result of finding that statutory fees are a separate issue from contingent fees, the Supreme Court held that a contingency fee agreement which required a client to pay his attorney more than the court awarded statutory fees was enforceable.  495 U.S. at 90.  Although the specific contract at issue in *Venegas* provided that the amount of the contingency fee was to be offset by the amount of the statutory fee, the Supreme Court's rationale is not limited to this factual scenario.  For example, the Supreme Court explicitly stated that "[s]ection 1988 itself does not interfere with the enforceability of a contingent fee contract," drawing no distinction between contingency fee contracts that allow for offsets and those that do not.  *See id*.  The Supreme Court echoed this holding twelve years after *Venegas* in *Gisbrecht v. Barnhart*, stating that in cases involving statutory fees, "nothing prevents the attorney for the prevailing party from gaining additional fees, pursuant to contract, from his own client."  535 U.S. 789, 807 (2002).  The Supreme Court also laid out a policy rationale for its holding in *Venegas*, stating that "depriving plaintiffs of the option of promising to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further § 1988's general purpose of enabling such plaintiffs in civil rights cases to secure competent counsel."  *Venegas*, 495

16

U.S. at 89-90.  Nothing about this policy rationale is unique to contingency fee contracts that allow for an offset.

Although *Venegas* happened to arise under the fee shifting provision of § 1988, this Court sees no reason why the Supreme Court's holding should not apply with equal force to the fee shifting provisions of the Federal False Claims Act.  There is no language in *Venegas* to suggest that the Supreme Court's reasoning was unique to § 1988.  In fact, in the Supreme Court's later opinion in *Gisbrecht*, a case arising under the Social Security Act, the Supreme Court cited *Venegas* for the general proposition that "the lodestar method was designed to govern the imposition of fees on the losing party.  In such cases, nothing prevents the attorney for the prevailing party from gaining additional fees, pursuant to contract, from his own client." *Gisbrecht*, 535 U.S. at 806 (internal citations omitted).

Further, the policy rationale explained in *Venegas* is equally relevant in the context of the Federal False Claims Act. As with § 1988, the fee shifting provisions of the Federal False Claims Act are concerned with enabling plaintiffs to secure competent counsel.  Specifically, the legislative history of the Senate version of the Federal False Claims Act states that the "[u]navailability of attorneys fees inhibits and precludes many individuals, as well as their attorneys, from bringing civil

17

fraud suits." S. Rep. No. 99-345, at 29 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5294. Thus, as with the fee shifting provision of § 1988, "depriving plaintiffs of the option to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further" the Federal False Claims Act's purpose of enabling such plaintiffs to secure competent counsel. *See Venegas*, 495 U.S. at 89-90.

This Court is not alone in holding that *Venegas* applies to the Federal False Claims Act as well as § 1988. In *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.,* the United States District Court for the District of Colorado, applying *Venegas*, held that "the existence of a contingent fee agreement between [the plaintiff] and his counsel does not justify reducing the lodestar amount of attorneys' fees owed by the Defendant under 31 U.S.C. § 3730(d)(2)." 793 F. Supp. 2d 1260, 1264 (D. Colo. 2011). In reaching this conclusion, the *Maxwell* court stated that fee shifting under § 3730(d)(2) "is designed to shift all of the costs (including attorney fees) to the loser in an action. The fact that the winner's attorneys receive compensation from another source is irrelevant to the fee award." *Id.* Further, the Court in *Maxwell* recognized the fact that the plaintiff's attorneys were not required to use the statutory fee to offset the contingency fee, stating that "whether [plaintiff's]

18

attorneys will enforce their right to collect both the contingent fee as well as a statutory award, reduce it, or waive it altogether is beyond the purview of the issues before the Court." *Id.* at 1265.

In addition to *Maxwell*, many other courts, without making reference to *Venegas*, have acknowledged the existence of fee arrangements in *qui tam* litigation which allow lawyers to receive both a statutory fee and a contingency fee without offset. *See e.g. United States ex rel. Lefan v. General Electric Co.*, 394 Fed. App'x 265, 272 (6th Cir. 2010) (stating that an attorney's contingency fee award was "in addition to" statutory attorney fees and cost reimbursements); *United States ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1335 n.35 (M.D. Florida 2001) (rejecting the argument that an award of statutory fees would represent a windfall to a relator's attorney who also recovered a contingent fee because "to obtain the necessary professional advice and assistance, [relator] remains free to distribute his recovery as he sees fit"); *United States ex rel. Poulton v. Anesthesia Associates of Burlington, Inc.*, 87 F. Supp. 2d 351, 359 (D. Vt. 2000) (granting an upward adjustment of lodestar under § 3730(d)(1) even though attorneys had "already recovered handsomely through their contingency fee arrangement"); *United States ex rel. John Doe I v. Pennsylvania Blue Shield*, 54

19

F. Supp. 2d 410, 413 (E.D.P.A. 1999) (awarding statutory fees under § 3730(d)(1) even though relators had already paid a forty percent contingency).  In contrast, the Court is aware of no cases which suggest that the Federal False Claims Act precludes an attorney from receiving both statutory and contingency fees.

Despite the case law above, Dr. DePace urges this Court to reject the reasoning in *Maxwell* because *Maxwell* was interpreting § 3730(d)(2), and not § 3730(d)(1).  According to Dr. DePace, this distinction is relevant because in non-intervention cases where § 3730(d)(2) is applicable, "the risk is great, the work is more, and the relator is entitled to a greater award than in an intervention case."  (Pl.'s Br. in Further Supp., at 20.)  In contrast, "once the government intervenes, it is only the exceptional and rare case that there is any risk for the relator or relator's counsel."  (*Id.*)  Further, "[t]he effect of government intervention on the Relator and his counsel is to relieve both of the rigors, expense and more substantial risk of failure."  (Pl.'s Supplemental Br., at 4.)  As a result of these differences between intervention and non-intervention cases, Dr. DePace maintains that *Maxwell* is not relevant to the instant case.

The Court disagrees.  Initially, the Court notes that Dr. DePace provides no case law or statistics to support his broad

generalizations about the amount of risk and work involved in intervention and non-intervention cases.  Additionally, the Court's experience in the instant litigation convinces the Court that Dr. DePace's generalizations are inaccurate.  The instant litigation has spanned five years.  The Government did not formally intervene until shortly before settlement.  Thus, for nearly the entire duration of this litigation, the Pietragallo Firm represented Dr. DePace under circumstances no different from a non-intervention case.  Had the Government opted not to intervene, the Pietragallo Firm faced enormous risk.  If the firm decided to withdraw from the representation at that point, and there was no recovery, it would have received no fees despite spending five years representing Dr. DePace.  (Pietragallo Br. in Opp. Ex. G, at 6-7.)

Further, assuming *arguendo* that Dr. DePace is correct about the differences between intervention and non-intervention cases, the Court still finds that an attorney can receive both a contingency fee and a statutory fee under § 3730(d)(1).  The language in § 3730(d)(1) and § 3730(d)(2) is identical, and there is no legislative history to suggest that Congress intended this identical language to be interpreted differently.  Thus, practical differences in the nature of intervention and non-intervention cases are not an excuse for the Court to ignore the plain language of the statute.  In addition, holding that

§ 3730(d)(1) prohibits an attorney from receiving both a statutory fee and a contingency fee directly contradicts the Supreme Court's reasoning and language in *Venegas* and *Gisbrecht*.

In sum, this Court finds that the fee shifting provisions of the Federal False Claims Act do not prohibit an attorney from receiving both statutory attorneys' fees and a contingency fee. Therefore, the Federal False Claims Act does not invalidate the Contingency Fee Agreement between Dr. DePace and the Pietragallo Firm.

**V.**


**A.**

Although the Court has found that neither the Settlement Agreement nor the Federal False Claims Act precluded the Pietragallo Firm from receiving both a contingency fee and a statutory fee, the Contingency Fee Agreement is only enforceable if the total fee received by the Pietragallo Firm is reasonable. New Jersey Rule of Professional Conduct 1.5(a) ("Rule 1.5(a)")

states that "a lawyer's fee shall be reasonable."[4]  The New Jersey Rules of Professional Conduct bind this court by virtue of Local Civil Rule 103.1(a), which states that "[t]he Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court."

The Court finds that the total fee received by the Pietragallo Firm is reasonable under Rule 1.5(a).  Although the Court agrees with Dr. DePace that the rote addition of a contingency fee to a statutory fee is not an automatic formula for determining reasonableness, in this case the addition does produce a reasonable fee.  This case is not one where the additional contingency fee sought by the law firm is so large

---

[4]  Rule 1.5(a) also lists eight factors to be considered in determining the reasonableness of a fee.  These factors are:
1.  The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
2.  The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
3.  The fee customarily charged in the locality for similar legal services;
4.  The amount involved and the results obtained;
5.  The time limitations imposed by the client or by the circumstances;
6.  The nature and length of the professional relationship with the client;
7.  The experience, reputation, and ability of the lawyers performing the services;
8.  Whether the fee is fixed or contingent.
The Court finds that all of these factors militate in favor of the fee requested by the Pietragallo Firm.

that the firm's total fees dwarf the plaintiff's recovery, or even exceed the Plaintiff's recovery.  On the contrary, pursuant to the Distribution Memo of January 31, 2013, the Pietragallo Firm seeks a thirty percent contingency fee in addition to statutory fees of $430,000.00.  In total, the Pietragallo Firm would thus receive forty-one percent of Dr. DePace's and the Pietragallo Firm's combined recovery.[5]

These fees are perfectly in line with the fees received by lawyers in *qui tam* cases across the country.  (Pietragallo Br. in Opp. Ex. II.)  Further, the Pietragallo Firm has provided numerous affidavits from prominent *qui tam* lawyers who assert that fee agreements like the one at issue in this case are typical in *qui tam* litigation under the Federal False Claims Act.  (*E.g.* Pietragallo Br. in Opp. Ex. A (stating that it is "standard

---

[5]  This percentage is reached by dividing the total attorneys' fees sought, $1,150,918.25, by the sum of the relator's share and the statutory fee award.  The precise fraction is $1,150,918.25/($2,403,060.63+$430,000.00).

Further militating in favor of finding this percentage reasonable is that the Pietragallo Firm receives no credit in its contingency fee for the over $12 million recovery of the State and Federal Governments.  The contingency fee is calculated solely based on the amount of Dr. DePace's share.  Although the Court is aware that the Pietragallo Firm does not represent the Government, it is common in *qui tam* cases for the Government to work closely with the Relator's attorneys.  Additionally, a representative of the Federal Government represented to the Court in oral argument held on April 19, 2013, that the Pietragallo Firm did work closely with the Government in this case.

24

practice" for *qui tam* attorneys to receive both their reasonable hourly fees and costs paid by the defendant, and a contingency fee paid by the client); *id*. Ex. B ("[I]t is standard practice of attorneys representing *qui tam* relators to enter into retainer agreements . . . under which counsel are paid both a 'contingent fee' . . . as well as attorneys' fees recovered from the defendant(s).")).  The Government has also filed a letter in this case stating its position that § 3730(d)(1) does "not preclude a relator from entering into an agreement with counsel providing for an additional contingent fee based upon any relator share recovered."  (Letter from Counsel for the United States.)

The legitimate risk of non-payment in *qui tam* cases also convinces the Court that the forty-one percent fee sought by the Pietragallo Firm is reasonable.  Unlike more conventional legal representation, the success of a *qui tam* suit depends in large part on the actions of a third party - the Government.  Further, litigating cases under the *qui tam* provisions of the Federal False Claims Act can often take many years, (*E.g.* Pietragallo Br. in Opp. Ex. A ¶ 15; *id*. Ex. B ¶ 10,) and the Government's decision to intervene can occur at any time.  In the instant case, it took the Government five years to intervene.  During these five years, the Pietragallo Firm was receiving no payment for its representation of Dr. DePace.  At the end of the five

25

years, had the Government opted not to intervene, the Pietragallo Firm faced a substantial risk of receiving no payment despite its prolonged representation of Dr. DePace.

### B.

Even though the Court finds the amount of the fee owed to the Pietragallo Firm to be reasonable, the Contingency Fee Agreement may nonetheless be unenforceable if New Jersey ethical rules make the "double recovery" of statutory fees and a contingency fee per se unreasonable.  Over the course of his four briefs, Dr. DePace cites to a veritable laundry list of New Jersey ethical rules and New Jersey Supreme Court decisions in support of this argument.  (Pl.'s App. for Emergent Relief, at 7-13; Pl.'s Supplemental Br., at 9-10; Pl.'s Br. in Further Supp. of Mot., at 1-11.)  Nonetheless, the Court finds that there is no law in New Jersey which prohibits the Pietragallo Firm from being paid as they were in this case.

First, Dr. DePace argues that the Pietragallo Firm's fee in this case is not reasonable because under the Settlement Agreement the Pietragallo Firm was paid "for nearly every penny of its time." (Pl.'s App. for Emergent Relief, at 10.) Therefore, "an additional bonus fee without proper consideration of fee enhancement criteria is per se unreasonable" under Rule

1.5(a).  (*Id.*)

The Court disagrees.  In *Szczepanski v. Newcomb Medical Center, Inc.*, the New Jersey Supreme Court cited *Venegas* with approval for the proposition that "statutory-fee awards and fees payable under contingent-fee agreements are distinct and independent concepts."  661 A.2d 1232, 1239 (N.J. 1995).  Given that the New Jersey Supreme Court has recognized the central holding of *Venegas*, it would not make sense if any fee payable by a prevailing party to his lawyer after the lawyer had already received statutory fees from the losing party were unreasonable under Rule 1.5(a).  Such an interpretation of Rule 1.5(a) would eviscerate the notion that "the lodestar method was designed to govern the imposition of fees on the losing party.  In such cases, nothing prevents the attorney for the prevailing party from gaining additional fees, pursuant to contract, from his own client." *Gisbrecht*, 535 U.S. at 807.  Therefore, the Court declines to adopt such a reading of Rule 1.5(a).

Dr. DePace next argues that double recovery is unethical in this case because the Pietragallo Firm attempted to conceal the existence of the Contingency Fee Agreement from the Court.  Dr. DePace's presentation of this argument is far from concise.  The argument is presented over four separate briefs, and cites to different case law and ethical rules each time it is presented.

27

As best the Court can tell, the argument is essentially two
pronged.  First, the failure to disclose is in direct violation
of New Jersey Rule of Professional Conduct 3.3(a)(5) ("Rule
3.3(a)(5)"), which states that "a lawyer shall not knowingly fail
to disclose to the tribunal a material fact knowing that omission
is reasonably certain to mislead the tribunal."  (Pl.'s Letter
Br., at 4.)  Second, the failure to disclose the agreement
conflicts with the New Jersey Supreme Court's decision in *Rendine
v. Pantzer,* 661 A.2d 1202 (N.J. 1995), which sets guidelines for
when a court can enhance the fee amount a lawyer receives under
fee shifting statutes.  (Pl.'s Br. in Further Supp., at 6.)

    The Court is puzzled by this line of argument.  It is
immaterial that no representation was made to the Court in this
case because the Court played no role in setting the fee that
Cooper was obligated to pay under § 3730(d)(1).  The statutory
fees were agreed to privately by the parties during settlement
negotiations.  Therefore, under Rule 3.3(a)(5) it cannot be said
that the failure to disclose the Settlement Agreement was
"reasonably certain to mislead the Court" because there was
simply no opportunity for the Court to be misled.

    Dr. DePace's reliance on *Rendine* is similarly misplaced.  In
*Rendine*, the New Jersey Supreme Court addressed the issue of
whether a court awarding attorneys' fees under a state fee

shifting statute was permitted to enhance the fee award based on the "essentially contingent nature of the counsel-fee arrangement."  661 A.2d at 1218.  The New Jersey Supreme Court ultimately held that "the trial court, after having carefully established the amount of the lodestar fee, should consider whether to increase that fee to reflect the risk of non-payment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome."  *Id*. at 1228.

As with Rule 3.3(a)(5), *Rendine* has no applicability in this case.  Whether the Pietragallo Firm was entitled to a fee enhancement was not an issue in this case because the Court was never asked to determine a fee award under § 3730(d)(1). Further, *Rendine* is entirely silent as to whether an attorney can receive both a statutory fee and a contingency fee.  The fact that the New Jersey Supreme Court held that a trial court may consider the contingent nature of a fee agreement in determining a reasonable fee under fee shifting statutes does not at all imply that an attorney cannot also receive payment under a contingency fee agreement with his client.  As already stated, an award of statutory fees and a private contingency fee agreement are "distinct and independent concepts."  *Szczepanski*, 661 A.2d at 1239.

Dr. DePace's reliance on *Rendine* is misplaced for another reason, namely that *Rendine* established criteria to be used by a trial court in determining a reasonable fee under state fee shifting statutes.  At issue in the instant case is a federal fee shifting statute, and the factors to be considered in determining a reasonable fee under a federal statute are not necessarily the same as those under a state statute.  For example, in *City of Burlington v. Dague*, the Supreme Court of the United States held that the Federal Resource Conservation and Recovery Act and the Clean Water Act did not permit enhancement of the lodestar fee on the basis of contingency.  505 U.S. 557, 567 (1995); *see also Rendine*, 661 A.2d at 1223.  This holding has been applied to other federal fee shifting statutes.  *See Rendine*, 661 A.2d at 1223.  Therefore, even if this were a case where the Court was called upon to determine a reasonable attorneys' fee, the Court would not be obligated to apply a contingency enhancement on the basis of *Rendine*.[6]

Another ethical argument advanced by Dr. DePace is that the

_____

[6]  The Court does not hold that contingency enhancements are prohibited under the Federal False Claims Act.  This issue is not before the Court because the Settlement Agreement does not include any enhancements.  The Pietragallo Firm represented to Cooper that a reasonable lodestar fee would be $458,000.00, and ultimately accepted $430,000.000 as the lodestar.  The Court relies on *Dague* only for the purpose of showing that *Rendine* is not binding precedent for statutory fees awarded under federal statutes.

addition of a contingency fee to a statutory fee is unreasonable because in cases where the contingency fee is larger than the statutory fee, New Jersey law requires the attorney to use the statutory fee to offset the contingency fee.  (Pl.'s Br. in Further Supp., at 9.)  In other words, Dr. DePace argues that a reasonable fee is an analysis of the "difference" between the statutory fee and the contingent fee.  In support of his argument, Dr. DePace relies on the decisions of *Singer v. State*, 472 A.2d 138 (N.J. 1984), and *Yakal-Kremski ex rel. Yakal-Kremski v. Deville Twp. Bd. of Ed.*, 748 A.2d 642 (N.J. Super. App. Div. 2000).

Despite Dr. DePace's assertions, these cases do not stand for the proposition that any New Jersey law or ethical rule prohibits an attorney from receiving both a contingency fee and a statutory fee.  *Singer* arises under the fee shifting provision of § 1988.  472 A.2d at 139.  The issue confronting the New Jersey Supreme Court was what method should be used to determine a reasonable fee under that fee shifting statute.  *Id.* at 142-45.  In detailing the correct method, the New Jersey Supreme Court noted that "an award made on the basis of [this method] does not disserve attorneys who customarily charge higher rates to their private clients" because "[i]n appropriate cases, they may charge clients in successful civil rights litigation the difference

31

between a reasonable fee awarded under the Awards Act and their normal rates." *Id*. at 145. *Singer*, however, does not say that this is the only way for an attorney to receive greater compensation than a statutory fee award, and is entirely silent as to whether attorneys can receive both a statutory fee and a contingency fee.

Dr. DePace's reliance on *Yakal-Kremski* is similarly misplaced. In *Yakal-Kremski*, the New Jersey Superior Court, Appellate Division, sought to determine criteria for awarding counsel fees under the New Jersey Tort Claims Act. The Appellate Division held that "the existence of a contingency fee retainer should not prevent the exercise of statutory discretion by the judge in assessing a reasonable award of fees." 748 A.2d at 646. In reaching this conclusion, the court cited to *Furey v. Cnty. of Ocean*, 670 A.2d 120 (N.J. Super. App. Div. 1996), stating "in *Furey*, we noted that allowing fees in that particular case would permit the decedent's widow and daughter to more fully recover their economic loss caused by death, as the award would relieve them of all or part of the *contingent fee* they are subject to on the recovery of their loss." *Id*. (emphasis in original) (internal citations and quotations omitted). Much like in *Singer*, the *Yakal-Kremski* court nowhere states that attorneys are prohibited from receiving both statutory and contingency fees, or

32

even addresses the issue.

Moreover, even if *Singer* and *Yakal-Kremski* did stand for the proposition that an attorney practicing in New Jersey could not receive both statutory and contingency fees, those decisions would not be controlling in the instant case.  First, *Singer* was decided six years prior to *Venegas*, and both cases interpret the same statute.  *Singer* does not purport to interpret any New Jersey specific law or ethical rule.  Therefore, to the extent that *Singer* disagrees with *Venegas*, this Court is bound by *Venegas*.

In contrast, *Yakal-Kremski* does interpret a New Jersey specific statute, namely the New Jersey Tort Claims Act. However, the policy behind the fee shifting provision of the Tort Claims Act is fundamentally different from the policy behind the fee shifting provisions of the Federal False Claims Act.  The purpose and policy underlying the fee shifting provision of the Tort Claims Act is to "reimburse an injured claimant to the full extent of his present and projected economic loss."  N.J. Stat. Ann. § 59:9-5 cmt.  Allowing an attorney to receive both a statutory fee and a contingency fee would arguably undermine this policy because the prevailing party would be obligated to pay the attorney out of his recovery.  In contrast, as stated in Section IV above, the policy behind the fee shifting provisions of the

33

Federal False Claims Act was to ensure that litigants had access to competent counsel.  This policy would not be undermined by allowing a party to choose to pay a contingency fee in addition to a statutory fee in order to secure his preferred counsel.[7]

Overall, because the Court finds that the total amount of the fee is reasonable and that no New Jersey law or ethical rule prohibits a fee structure wherein an attorney receives both a contingency fee and a statutory fee,[8] there is no basis for finding that the Contingency Fee Agreement in this case is unenforceable.[9]

---

[7]  Additionally, the Court notes that *qui tam* litigation is unique in that unlike the New Jersey Tort Claims Act and most other state and federal statutes that allow for fee shifting, the purpose of the award to a relator is not primarily for the purpose of making an injured party whole.  Instead, the relator's share is "generally viewed as a finder's fee."  *United States ex. rel. Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1332 (M.D. Fl. 2001.)

[8]  The Court is aware that Dr. DePace, in passing, lists other ethical grounds on which he believes the Contingency Fee Agreement is unenforceable, such as New Jersey Court Rule 1:21-7(b), and New Jersey Rule of Professional Conduct 2.1.  In addition, Dr. DePace briefly argues in his fourth brief that cross-checking the lodestar award with the contingency fee shows the contingency fee to be unreasonable, and that the amount of the statutory award was itself unreasonable.  Although the Court does not address these arguments in the body of this Opinion, it has considered these arguments and finds them all to be without merit.

[9]  The Court is aware that the Pietragallo Firm argues that Pennsylvania law should be applied to determine the reasonableness of the fee in this case.  However, because the Court finds that even under New Jersey law the fee is reasonable, it does not conduct a choice of law analysis.

**VI.**

For the foregoing reasons, Dr. DePace's Application to Reopen is granted.  However, the relief requested in his Application and subsequent briefs is denied.  The Contingency Fee Agreement entered into with the Pietragallo Firm is fully enforceable.  An appropriate order will accompany this Opinion.


Dated: April __22___, 2013


____s/Joseph E. Irenas_____

**Joseph E. Irenas, S.U.S.D.J.**

35